**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | **CRIMINAL NO.** |
| **OWEN M. GRIGSBY and HIMMEH KUAWOGAI,** | **VIOLATION: 18 U.S.C § 371** |
| **Defendants.** | |

## STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Himmeh Kuawogai ("Kuawogai"), with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea. If this this case were to proceed to trial, the parties stipulate the United States could prove the below facts beyond a reasonable doubt.

## I.    BACKGROUND

### a.    The Payment Protection Program

1.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of billions in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

2.      In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business.  The applicant of a

PPP loan was required to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the applicant had to state, among other things, its: (a) average monthly payroll expenses and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses.  To qualify for eligibility, businesses applying for a PPP loan needed to be in operation as of February 15, 2020.

3.      A PPP loan application had to be processed by a participating financial institution (the lender).  If a PPP loan application was approved, then the participating financial institution funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA").  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, were transmitted by the lender to the SBA in the course of processing the loan.

4.      PPP loan proceeds had to be used by the business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on the expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

5.      On or about December 27, 2020, the Economic Aid to Hard-Hit Small Business, Nonprofits and Venues Act provided additional funding for the PPP and extended the application deadline to March 31, 2021. The act enabled borrowers to take a second draw PPP loan under the same general terms as their first PPP loan, up to a maximum loan amount of $2 million. The act reopened the program to borrowers who did not previously receive a first draw PPP loan. To be

PPP loan was required to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the applicant had to state, among other things, its: (a) average monthly payroll expenses and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses. To qualify for eligibility, businesses applying for a PPP loan needed to be in operation as of February 15, 2020.

3.      A PPP loan application had to be processed by a participating financial institution (the lender). If a PPP loan application was approved, then the participating financial institution funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, were transmitted by the lender to the SBA in the course of processing the loan.

4.      PPP loan proceeds had to be used by the business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on the expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

5.      On or about December 27, 2020, the Economic Aid to Hard-Hit Small Business, Nonprofits and Venues Act provided additional funding for the PPP and extended the application deadline to March 31, 2021. The act enabled borrowers to take a second draw PPP loan under the same general terms as their first PPP loan, up to a maximum loan amount of $2 million. The act reopened the program to borrowers who did not previously receive a first draw PPP loan. To be

eligible for a second draw, borrowers had to employ no more than 300 employees, demonstrate a 25% reduction in gross receipts during a calendar quarter in 2020, and have expended the full amount of their initial PPP loan. Allowable expenses were expanded to include worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism during 2020, and certain supplier costs and expenses for operations. The expansion applied retroactively to first draw PPP loans not forgiven by the SBA.

6.      On or about March 25, 2021, the PPP Extension Act of 2021 extended the application deadline from March 31, 2021, to May 31, 2021. In addition to extending the PPP application filing window by 60 days, the Extension Act provided an extra 30 days for the SBA to finish processing applications received by the May 31, 2021, deadline.

### b.  The Economic Injury Disaster Loan Program

7.      An Economic Injury Disaster Loan ("EIDL") is an SBA-administered loan designed to provide assistance to small businesses that suffer substantial economic injury as a result of a declared disaster. An EIDL helps businesses meet necessary financial obligations that could have been met had the disaster not occurred. It provides relief from economic injury that the disaster caused and permits businesses to maintain a reasonable working capital position during the period that the disaster affected. Additionally, the SBA offers an EIDL advance designed to provide emergency economic relief to businesses experiencing a temporary loss of revenue. This advance does not have to be repaid and small businesses can receive an advance even if they are not approved for an EIDL.

8.      In March 2020, due to the COVID-19 pandemic, the SBA issued an Economic Injury Disaster Loan declaration. The declaration made EIDLs available nationwide to small businesses to help alleviate economic injury that COVID-19 caused. EIDLs were usually limited

to a maximum amount of $2 million. However, during the COVID-19 pandemic, EIDLs were limited, for a period of time, to $150,000.00. The amount of the loan and the amount of the advance were determined by the SBA based on information provided in the loan application.

9.     During the COVID-19 pandemic, EIDL funds were issued directly from the United States Treasury and applicants applied through the SBA via an online portal. The EIDL application process, which also used certain outside contractors for system support, collected information concerning the business and the business owner, including information as to the gross revenues for the 12 months prior to the disaster; the cost of goods sold; and information as to any criminal history of the business owner. Applicants were required to electronically certify that the information provided was accurate and were warned that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds could result in sanctions, including criminal penalties.

### c. Himmeh Kuawogai and Owen M. Grigsby

10.    Kuawogai is a resident of Ellicott City, Maryland. He is the owner, operator, and sole employee of HAK Accounting Services. Kuawogai is an accountant and Internal Revenue Service ("IRS") registered tax preparer.

11.    Kuawogai and Owen M. Grigsby ("Grigsby") are friends and relatives. Grigsby is employed by the Metropolitan Police Department ("MPD"), the primary law enforcement agency for the District of Columbia. MPD Headquarters is located in Washington, D.C. Grigsby has been an MPD Officer since October 15, 2007. Grigsby is currently assigned to the Overnight (1st watch) as a Patrol Officer for the Fifth District, which is located in the Northeast quadrant of Washington, D.C.

## II.    THE CONSPIRACY

### a.  Owen Grigsby Associates, LLC

12.    Grigsby and Kuawogai created Owen Grigsby Associates, LLC ("OGA"), a self-registered business. On July 7, 2020, Kuawogai sent Grigsby, who was in the District of Columbia at the time, an email and link to the Maryland State Express Business Registration and Filings website. Approximately 20 minutes later, Kuawogai sent Grigsby another email with the subject line "IRS Business Registration." Attached to that email was a "Form CP 575G," which indicated that the Employee Identification Number (EIN) 85-1790815 had been assigned to OGA.

13.    Grigsby filed OGA's articles of organization on or about July 7, 2020. On or about August 8, 2020, while in the District of Columbia, Grigsby used his cell phone to forward an email to Kuawogai confirming that he registered OGA in Maryland, causing interstate wire communications to be sent in furtherance of the scheme to defraud. Shortly after, Kuawogai responded to Grigsby with an email, which included an attachment showing OGA's articles of organization were certified on August 8, 2020, using the login credentials Grigsby previously provided Kuawogai. The listed address for OGA was Grigsby's primary residence.

14.    On September 28, 2020, Grigsby opened a Bank of America account, ending in -9614, on behalf of OGA. The signature card for this account was signed by Grigsby. In the days leading up to September 28, 2020, Grigsby and Kuawogai communicated extensively about opening OGA's Bank of America account.

15.    OGA had no legitimate purpose and was solely created to obtain EIDL and PPP loans.

### b.  Owen Grigsby Associates, LLC and the Two EIDL Applications

16.     Between July 2020 and present day, Grigsby, knowingly and willfully, filed two EIDL applications on behalf of OGA containing materially false statements to the SBA. Kuawogai assisted Grigsby with these fraudulent loan applications by providing him with amended and fake documents and explaining the loan application process to him via messaging applications, the phone, and email. Kuawogai assisted Grigsby despite knowing that Grigsby never intended to use the loan funds for a legitimate business purpose.

17.     On or about October 11, 2020, Kuawogai helped Grigsby apply for an EIDL on behalf of OGA in the amount of $53,600.00. The application claimed that OGA was established on August 18, 2018, which is approximately two years earlier than the actual date of incorporation, had one employee (Grigsby), and fell into the "Finance-Other" business category. The application listed Grigsby as the owner with 100% ownership. It further indicated that in 2019, when OGA had yet to be incorporated, OGA had gross revenues of $107,640.00 with a stated monthly revenue of $8,937.08 and monthly sales of $8,937.08. While in the District of Columbia, Grigsby used his phone to forward an email from the SBA to Kuawogai that confirmed Grigsby had submitted his application, causing an interstate wire communication.

18.     On or about October 11, 2020, a contractor working for SBA emailed Grigsby asking for additional information related to OGA's EIDL application, which Grigsby forwarded to Kuawogai. Later that day, Kuawogai responded to Grigsby's email, writing: "Send this and your license to respond to the request[.]" Attached to Kuawogai's email was a PDF of OGA's articles of organization, which Kuawogai had altered. Kuawogai modified the filing date listed on OGA's articles of organization from July 7, 2020, to July 18, 2018. By modifying the filing date to 2018, OGA appeared to the SBA as if it were operational during calendar year 2019, as required to

qualify for the loan. On or about October 12, 2020, Grigsby responded to the email he received from the SBA contractor with a picture of his driver's license and OGA's altered articles of organization. Subsequently, Grigsby signed and executed a loan agreement with the SBA for the amount $53,700.00.

19. On or about October 20, 2020, the SBA disbursed the $53,600.00 loan to OGA's Bank of America Account ending in -9614.

20. On or about December 30, 2021, Kuawogai helped Grigsby apply for a modification of his original EIDL on behalf of OGA in the amount of $214,500.00. As part of his modification loan application, Grigsby provided the SBA an IRS Form 1040-X, "Amended Individual Income Tax Return" for 2019. As part of those amended tax forms, Kuawogai filled out and provided Grigsby with a Form 1040, "Profit or Loss from Business (Sole Proprietorship)" on behalf of OGA, even though OGA did not exist in 2019. On that form, Kuawogai and Grigsby asserted OGA had a gross income of $107,640 with a profit of $37,854, which was not true. On or about January 8, 2022, the SBA emailed Grigsby a declination letter informing Grigsby that his loan modification application for $214,500.00 had been declined due to "unverifiable information." Shortly after receiving this email, Grigsby forwarded the email communication to Kuawogai.

c. **Owen Grigsby Associates, LLC and the Two PPP Loans**

21. On or about March 10, 2021, Kuawogai and Grigsby exchanged the following text messages while Grigsby was at work in the District of Columbia, causing interstate wire communications to be sent:

      a. Kuawogai: "You want the PPP? I can get you over 40K. Just [throw] me 3k."

      b. Grigsby: "How much can you get me"

    c.  Kuawogai: "At least 41k"

22.    Between July 2020 and present day, Kuawogai helped Grigsby to submit two PPP loan applications on behalf of OGA containing materially false statements to Harvest Small Business Finance, LLC ("HSBF"), a FDIC insured financial institution that engages in interstate commerce. Kuawogai assisted Grigsby with these loan applications by providing him with amended and fake documents and explaining the loan application process to him via messaging applications, the phone, and email.

23.    On or about April 5, 2021, Grigsby electronically signed a PPP "Borrow Application Form" on behalf of OGA. In this application, Grigsby, knowingly and willfully indicated that OGA was established in January 2018, which was approximately 2.5 years earlier than the actual date of incorporation in or about July 2020. Grigsby also indicated the gross income for the company was $0.00 in 2019, and $103,540.00 in 2020, which was false. On or about April 15, 2021, while in the District of Columbia, Grigsby submitted a "Promise to Pay Note" to the SBA, indicating that he would repay the PPP loan, causing interstate wire communications to be sent.

24.    As part of this application, Grigsby electronically signed a document acknowledging that he could apply for forgiveness of the loan for any amount spent on a number of business-related expenses, including, payroll costs, rent obligations, utility payments, and operating expenditures. He further certified that that the loan was "necessary to support the ongoing operations" of OGA and that the loan funds would be "used only to retain workers and to maintain payroll or other payments" specifically related to the business, such as rent obligations, utility payments, and operating expenditures.

25.     As part of this application, Grigsby provided an Internal Revenue Service (IRS) Form 1040, "Profit or Loss From Business (Sole Proprietorship)." In that form, he listed OGA as the business name, and indicated that his gross income was $103,540.00, which was false. He further indicated that he had "materially participated" in the operation of the business during 2020, which was also false.

26.     SBA approved Grigsby's loan application for OGA for $20,833.00. On or about April 20, 2021, $20,833.00 was disbursed into OGA's Bank of America account ending in -9614.

27.     On or about April 24, 2021, while in the District of Columbia, Grigsby received a notification from the SBA that OGA's PPP "Second Draw Borrower Application" was ready to be verified and signed. Later that day, Grigsby electronically signed the PPP "Second Draw Borrower Application Form" on behalf of OGA.  As Grigsby had indicated in the initial "Borrower Application Form," he once again asserted OGA was established in January 2018, the gross income for the company was $0.00 in 2019, and $103,540.00 in 2020, which was false. Grigsby initialed his understanding that the funds would be used to "retain workers and maintain payroll" or make other business-related expenses, such as rent obligations, utility payments, and operations expenditures. He further initialed his understanding that loan forgiveness would only be provided for the sum of these documented costs, and that not more than 40% of the forgiven amount would be for non-payroll costs.  Grigsby submitted the application while in the District of Columbia, causing interstate wire communications to be sent in furtherance of the scheme to defraud.

28.     SBA approved Grigsby's "Second Draw" loan application for OGA for $20,833.00. On or about May 5, 2021, $20,833.00 was disbursed into OGA's Bank of America account ending in -9614.

29.     On or about June 28, 2021, Grigsby sent Kuawogai a text message: "Bro please

don't forget to give me whatever documents I may need to have this stuff forgiven." Kuawogai response shortly after, "I got you bro[.]" On or about July 26, 2021, Kuawogai, knowingly and willfully, sent Grigsby via email a fake invoice for $9,000 for accounting services. Grigsby used the fake invoice as part of his applications for PPP loan forgiveness.

30.    On or about August 7, 2021, Grigsby submitted Form 3508S, "PPP Loan Forgiveness Application," on behalf of OGA for the initial $20,833.00 loan from HSBF for OGA. As part of that application, Grigsby affirmed that he had complied with all requirements of the PPP Program rules, including the eligible uses of PPP loan proceeds and the amount of PPP loan proceeds that had to be used for payroll costs. In fact, Grigsby had not complied with the PPP Program rules and misspent the PPP funds he received as part of his first fraudulent PPP loan application. Kuawogai assisted Grigsby with the loan forgiveness application knowing that Grigsby had not complied with the PPP Program rules.

31.    On or about August 7, 2021, Grigsby submitted an additional Form 3508S, "PPP Loan Forgiveness Application," on behalf of OGA for the "Second Draw" $20,833.00 loan from HSBF for OGA. As part of that application, Grigsby once again affirmed that he had complied with all requirements of the PPP Program rules, including the eligible uses of PPP loan proceeds and the amount of PPP loan proceeds that had to be used for payroll costs. Kuawogai assisted Grigsby with the loan forgiveness application knowing that Grigsby had not complied with the PPP Program rules.

**d.  Grigsby Pays Kuawogai for his Help Obtaining Fraudulent Loans**

32.    On or about April 20, 2021, the same day OGA received its first $20,833.00 PPP loan, while in the District of Columbia, Grigsby used CashApp to pay Kuawogai $1,500.00, or approximately 7.5 percent of the total PPP loan OGA received, causing interstate wire

10

communications to be sent. Grigsby paid Kuawogai $1,500.00 in exchange for his help obtaining the fraudulent PPP loan.

33.     On or about May 5, 2021, the same day OGA received its second $20,833.00 PPP loan, Grigsby again used CashApp to pay Kuawogai 1,500.00, or approximately 7.5 percent of the total second PPP loan OGA received. Grigsby paid Kuawogai $1,500.00 in exchange for his help obtaining the second fraudulent PPP loan.

34.     In sum, starting in July 2020, and continuing at least until February 20, 2022, Kuawogai and Grigsby, knowingly and willfully agreed to file fraudulent loan applications to obtain EIDL and PPP loans for Grigsby.  As a result of the fraudulent loan applications, Grigsby paid Kuawogai for this help obtaining the fraudulent loans.  Grigsby received a $53,600.00 EIDL and a total of $41,666.00 in PPP loans.

Respectfully submitted,

MATTHEW GRAVES
United State Attorney

By:     /s/ *Rebecca G. Ross*
        Rebecca Ross (N.Y. BAR #5590666)
        Assistant United States Attorney
        601 D Street N.W.
        Washington, D.C.  20530
        Rebecca.Ross2@usdoj.gov
        (202) 815-8982

**Defendant's Acceptance**

I have read this Statement of the Offense and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Statement of the Offense and all matters relating to it. I fully understand this Statement of the Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Defendant Himmeh Kuawogai

4/11/24
Date


**Defense Counsel's Acknowledgment**

I am Defendant Himmeh Kuawogai's attorney. I have reviewed every part of this Statement of the Offense with him. It accurately and completely sets forth the Statement of the Offense agreed to by Defendant and the Office of the United States Attorney for the District of Columbia.

John O. Iweanoge, II

04 11 2024
Date

12